# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| FIRST HORIZON BANK, successor by conversion to First Tennessee Bank National Association, | |
| Plaintiff, | |
| v. | CIVIL ACTION NO. |
| | _____ |
| KEITH KANTOR; KAREN KANTOR, individually and in her capacity as trustee of the KIG Trust; KIMBERLY KANTOR, in her capacity as trustee of the KIG Trust; RYAN KANTOR, in his capacity as trustee of the KIG Trust; MICHAEL COHEN, in his capacity as trustee of the KIG Trust; KIG TRUST; BDKK, LLC; MVKK, LLC; KEKA SUGARLOAF, LLC; NAMEDPROGRAM, LLC; SERVICE FOODS, INC.; and KIC FOODS, INC., | |
| Defendants. | |

## COMPLAINT

COMES NOW Plaintiff First Horizon Bank, successor by conversion to First Tennessee Bank, National Association ("First Horizon")[1], and states its complaint against the above-named Defendants as follows:

---

[1] Effective October 25, 2019, First Tennessee Bank, National Association converted from a nationally chartered bank to a for-profit Tennessee corporation.

## PARTIES

1.      Plaintiff First Horizon is a national banking association duly authorized to transact business in the State of Georgia with a principal place of business at 165 Madison Avenue, Memphis, Tennessee.

2.      Defendant Keith Kantor is an individual residing at 5830 Twelfth Fairway, Forsyth County, Suwanee, Georgia 30024, where he may be served with process.

3.      Defendant Karen Kantor is an individual residing at 5830 Twelfth Fairway, Forsyth County, Suwanee, Georgia 30024, where she may be served with process.  Karen Kantor is a defendant both in her individual capacity and in her capacity as co-trustee of the KIG Trust.

4.      Defendant Kimberly Kantor is an individual residing at 7025 Van Gogh Drive, Plano, Texas 75094, where she may be served with process.  Kimberly Kantor is a defendant solely in her capacity as co-trustee of the KIG Trust.

5.      Defendant Ryan Kantor is an individual residing at 14 Iron Bound Place NW, Fulton County, Atlanta, Georgia 30318, where he may be served with process. Ryan Kantor is a defendant solely in his capacity as co-trustee of the KIG Trust.

6.      Defendant Michael Cohen ("Cohen") is an individual residing at 2915 Monticello Drive, Forsyth County, Cumming, Georgia 30041, where he may be

served with process.  Cohen is a defendant solely in his capacity as co-trustee of the KIG Trust.

7.      Defendant BDKK, LLC ("BDKK") is a Florida limited liability company that may be served through its manager-members Keith Kantor or Karen Kantor at 5830 The Twelfth Fairway, Suwanee, Georgia.

8.      Defendant MVKK, LLC ("MVKK") is a Georgia limited liability company whose principal office address is 5830 The Twelfth Fairway, Suwanee, Georgia 30024.  MVKK may be served through its Registered Agent Keith Kantor at 5830 The Twelfth Fairway, Suwanee, Georgia, 30024.

9.      Defendant KEKA Sugarloaf, LLC ("KEKA Sugarloaf") is a Georgia limited liability company whose principal office address is 5830 The Twelfth Fairway, Suwanee, Georgia 30024.  KEKA Sugarloaf may be served through its Registered Agent Keith Kantor at 5830 The Twelfth Fairway, Suwanee, Georgia, 30024.

10.     Defendant NAMEDProgram, LLC ("NAMEDProgram") is a Georgia limited liability company whose principal office address is 5830 The Twelfth Fairway, Suwanee, Georgia 30024.  NAMEDProgram may be served through its Registered Agent Keith Kantor at 5830 The Twelfth Fairway, Suwanee, Georgia, 30024.

11.     Defendant Service Foods, Inc. ("Service Foods") is a Georgia corporation that administratively dissolved on or around December 7, 2016. Service Foods' previous registered agent resigned on or around October 27, 2017, and no replacement registered agent was ever appointed. Service Foods may be served with process through Keith Kantor, Service Food's sole officer listed in its last annual registration.  Pursuant to O.C.G.A. § 14-2-504(b), Service Foods may also be served via certified mail addressed to its Keith Kantor at Service Foods' principal office on file with the Secretary of State, 4355 International Boulevard, Norcross, Georgia 30093. To the extent service through the above methods cannot be had, Service Foods may be served through the Georgia Secretary of State pursuant to O.C.G.A. § 9-11-4(e)(1).

12.     KIC Foods, Inc. ("KIC Foods") is a Texas corporation whose principal place of business is 5830 The Twelfth Fairway, Suwanee, Georgia 30024.  KIC Foods may be served with process through its sole officer Keith Kantor at 5830 The Twelfth Fairway, Forsyth County, Suwanee, Georgia 30024.

**JURISDICTION AND VENUE**

13.     First Horizon is a citizen of Tennessee.

14.     Except for Kimberly Kantor, each individual Defendant—i.e., Keith Kantor, Karen Kantor, Ryan Kantor, and Michael Cohen—resides in Georgia and is therefore a citizen of Georgia.

15.     Kimberly Kantor is a resident of Denton County, Texas, and a nonresident trustee within the meaning of O.C.G.A. §§ 53–12–320 to –323. She may be served through the Georgia Secretary of State as provided in O.C.G.A. § 53–12–320, because she is a nonresident trustee who has not designated an agent for service.

16.     BDKK is a limited liability company with two members, Keith Kantor and Karen Kantor, both of whom are citizens of Georgia. Accordingly, BDKK is a citizen of Georgia.

17.     MVKK is a limited liability company with two members, Keith Kantor and Karen Kantor, both of whom are citizens of Georgia. Accordingly, MVKK is a citizen of Georgia.

18.     KEKA Sugarloaf is a limited liability company with two members, Keith Kantor and Karen Kantor, both of whom are citizens of Georgia. Accordingly, KEKA Sugarloaf is a citizen of Georgia.

19.     NAMEDProgram is a limited liability company with one member, Keith Kantor, who is a citizen of Georgia. Accordingly, NAMEDProgram is a citizen of Georgia.

20. Service Foods is a Georgia corporation principally located in Georgia. Accordingly, Service Foods is a citizen of Georgia.

21. KIC Foods is a Texas corporation principally located in Georgia. Accordingly, KIC Foods is a citizen of Texas and Georgia.

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000.00 and there is complete diversity of citizenship between First Horizon, on the one hand, and all Defendants, on the other hand.

23. As to First Horizon's claims arising under the Federal Racketeer Influenced & Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (the "RICO Act"), this Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

24. As to First Horizon's claims arising under state law, this Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1367, as the state law claims are so related to First Horizon's federal RICO Act claims that they form part of the same case or controversy.

25. Except for BDKK, this Court has *in personam* jurisdiction over the remaining Defendants, because they are Georgia residents and/or are transacting substantial business and maintaining an office in Georgia.

26.    This Court has personal jurisdiction over BDKK because a Georgia court of general jurisdiction would have personal jurisdiction over BDKK. *See* Fed. R. Civ. P. 4(k)(1)(A).  Keith Kantor resides in Georgia and is BDKK's sole or controlling member. All of BDKK's tortious acts or omissions set forth herein were caused and directed by Keith Kantor. *See* O.C.G.A. § 9–10–91(2) ("A court of this state may exercise personal jurisdiction over any nonresident … as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he or she … Commits a tortious act or omission within this state[.]").

27.    Additionally, this Court has personal jurisdiction over all Defendants pursuant to the nationwide service of process provided for under the federal RICO Act. *See* 18 U.S.C. § 1965; *Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997) ("Section 1965(d) of the RICO statute provides for service in any judicial district in which the defendant is found. When a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction.").

28.    Venue is proper pursuant to 28 U.S.C. § 1391, because the Northern District of Georgia is the judicial district in which one or more Defendants reside, where a substantial portion of the events or omissions giving rise to the claims stated

herein occurred, and where a substantial part of the property that is the subject of this action is located.

## BACKGROUND FACTS

29.     On November 30, 2006, First Horizon entered into a loan transaction to lend Service Foods revolving credit not to exceed an outstanding principal of $6,500,000 (the "Loan").

30.     The Loan is evidenced by, among other things, a Loan Agreement dated November 30, 2006, a Promissory Note dated November 30, 2006, and a Security Agreement dated November 30, 2006 (collectively, the "Original Loan Documents").

31.     Pursuant to the provisions of the Original Loan Documents, Service Foods granted First Horizon a first-priority security interest in certain assets of Service Foods including, but not limited to, any and all accounts, accounts receivable, notes receivable, instruments, chattel paper, collateral, deposit accounts, tax refunds, contract rights, general intangibles, customer lists, original books and records, ledger and account cards, computer tapes, discs and printouts, other proceeds of any kind whatsoever, derived, generated, or related.

32.     In September 2007, First Horizon agreed to increase the credit limit of the Loan to $11,000,000, and the parties amended the Original Loan Documents in connection therewith (the "First Loan Amendment").

33.     The First Loan Amendment is documented by, among other things, a Guaranty Agreement dated September 12, 2007 from Service Foods affiliate Service Foods Southern Division LLC ("Southern Division"), a Guaranty Agreement dated September 12, 2007 from Service Foods affiliate H-Son Financial Inc. ("H-Son"), a Guaranty Agreement dated September 12, 2007 from Service Foods principal Harold Pounders, and a Guaranty Agreement dated September 12, 2007 from Service Foods principal Keith (all such Guaranty Agreements collectively referred to as the "Guaranty Agreements" and all such Guarantors referred to as the "Guarantors" herein below).

34.     Thereafter, between November 2011 and May 2015, the parties amended the terms of the Loan on 16 additional occasions (the Original Loan Documents, the First Loan Amendment, the Guaranty Agreements, and all other agreements, instruments, and documents evidencing subsequent amendments of the Loan hereafter referred to as the "Loan Documents").

35.     The Loan matured on June 30, 2015, but Service Foods failed to repay the balance of the Loan at that date.

36.    The Guarantors likewise failed to repay the balance of the Loan at maturity.

### *The Lawsuit and resulting Judgment*

37.    On August 19, 2015, First Horizon commenced a lawsuit in this Court styled *First Horizon Bank, National Association v. Service Foods, Inc., d/b/a Blue Ribbon Foods, Service Foods Southern Division, LLC, c/b/a Southern Foods at Home, H-Son Financial, Inc., d/b/a/ Jefferson Financial, Harold T. Pounders, and Keith Kantor,* Case No. 15-cv-02940-CAP (the "Lawsuit").

38.    In the Lawsuit, First Horizon asserted claims against Service Foods and the Guarantors in Counts I through V of its complaint (the "First Complaint," as may have been amended from time to time) to enforce and collect on the Loan Documents.

39.    Additionally, First Horizon asserted claims against Harold Pounders and Keith Kantor for conversion, fraud, breach of fiduciary duty, and punitive damages in Counts VI through XVI of the First Complaint.

40.    The conversion claims at Counts VI, VII, and VIII of the First Complaint pertain in part to Keith Kantor's use of his ownership and control over Service Foods and H-Sons to cause those entities to convert proceeds from the sales of accounts that were subject to First Horizon's first-priority security interests.

41.     The conversion claim asserted as Count X in the First Complaint pertains in part to Keith Kantor misappropriating First Horizon's cash collateral (held in accounts belonging to Service Foods) to pay for unauthorized, non-business related, and personal expenditures.

42.     Specifically, Keith Kantor (and his co-principal Harold Pounders) disbursed or caused the following tortious disbursements of First Horizon's cash collateral among others:

(a)     $34,465 to BDKK, an entity owned and controlled by Keith Kantor and Karen Kantor;

(b)     $1,757,806 to Clarisy Group, an entity owned and controlled by Harold Pounders and Keith Kantor;

(c)     $2,018,228 to Clarisy Group, Inc., an entity owned and controlled by Harold Pounders and Keith Kantor;

(d)     $240,217 to Clarisy Group, LLC, an entity owned and controlled by Keith Kantor;

(e)     $31,990 to International Boulevard Partners, LLC, an entity owned and controlled by Keith Kantor;

(f)     $594,182 to Josephine Kantor, Keith Kantor's deceased aunt;

(g)     $3,984,769 to KIC Foods, an entity owned and controlled by Keith Kantor;

(h)     $250,000 to KIG Trust, a trust owned and controlled by Keith Kantor for the benefit of himself and related individuals;

(i)     $36,829 to KMT Group LLC, an entity owned or controlled in whole or in party by Harold Pounders and Keith Kantor;

(j)     $81,843 to KMT Ventures, LLC, an entity owned or controlled by Harold Pounders and Keith Kantor;

(k)     $157,687 to KP Ventures LLC, an entity owned or controlled by Harold Pounders and Keith Kantor;

(l)     $606,222 to Michele R. Pounders, Harold Pounders' spouse;

(m)     $253,349 to Midtown Imports, LLC, an entity owned or controlled by Harold Pounders and Keith Kantor;

(n)     $299,760 to North Peachtree Partners LLC, an entity owned or controlled by Harold Pounders and Keith Kantor;

(o)     $507,006 to Rossi Ventures, an entity owned or controlled by Harold Pounders and Keith Kantor;

(p)     $312,275 to Royal Parkway Partners, LLC, an entity owned or controlled by Harold Pounders and Keith Kantor;

(q) $2,705.36 to American Express for the payment of personal expenditures;

(r) At least $20 million to H-Son, an entity owned or controlled by Harold Pounders and Keith Kantor; and

(s) $24,942.27 to Schreeder, Wheeler & Flint for personal legal services to Harold Pounders and Keith Kantor.

43. First Horizon's claims for fraud at Counts XI and XII of the First Complaint pertain in part to false representations in various financial statements submitted by Keith Kantor in seeking and obtaining new advances of loan funds and extensions of the maturity date.

44. First Horizon's fraud claim at Count XIII of the First Complaint pertains in part to Keith Kantor directing or causing Service Foods to submit bogus customer account, receivable, and collection information to First Horizon to induce it to advance additional funds, extend the maturity date, defer collection activity, and forego exercising its other rights and remedies.

45. First Horizon's claim for breach of fiduciary duty at Count XIV of the First Complaint pertains in part to the fiduciary duty owed by officers of an insolvent company's creditors and Keith Kantor's breach of that duty by using Service Foods

assets for the benefit of himself and affiliated entities when Service Foods was insolvent.

46.     On March 6, 2017, First Horizon obtained a Final Judgment in the Lawsuit on Counts I through V of the First Complaint (the "Judgment") as follows:

> 1. Under Count I, First Tennessee is hereby awarded judgment against Service Foods for the principal sum of $10,312,771.73 plus pre-judgment interest of $366,267.24 through January 13, 2017, totaling $10,679,038.97. 2. Under Count II, First Tennessee is hereby awarded judgment against Southern Division for the principal sum of $10,312,771.73 plus pre-judgment interest of $366,267.24 through January 13, 2017, totaling $10,679,038.97. 3. Under Count III, First Tennessee is hereby awarded judgment against H-Son for the principal sum of $10,312,771.73 plus pre-judgment interest of $366,267.24 through January 13, 2017, totaling $10,679,038.97. 4. Under Count IV, First Tennessee is hereby awarded judgment against Pounders for the principal sum of $5,500,000.00. 5. Under Count V, First Tennessee is hereby awarded judgment against Kantor for the principal sum of $5,500,000.00. 6. Under Counts I through V, all costs shall be added to First Tennessee's judgment and post-judgment interest shall accrue on the principal sums awarded at the post-default contractual rate of 7.75% per annum.

47.     On or about March 17, 2017, the Clerk of Court issued a Writ of Execution on the Judgment as to Keith Kantor (the "Kantor Writ").

48.     First Horizon's remaining claims—all against Harold Pounders and Keith Kantor—remain pending but have been stayed since entry of the Judgment by agreement of the parties.

49.     Since entry of the Judgment, First Horizon has engaged in substantial post-judgment discovery in attempts to collect on the Judgment. First Horizon's post-judgment discovery remains ongoing.

50.     The entities against whom First Horizon obtained the Judgment—Service Foods, Southern Division, and H-Son—appear to have no assets and ceased operating in 2015. This relegates First Horizon to collecting the Judgment from Harold Pounders and Keith Kantor.

### *Post-Judgment Discovery and Investigation*

51.     First Horizon's post-judgment discovery thus far has included, among other things, depositions of Keith Kantor and Karen Kantor (the "Kantors," when referred to together), as well as obtaining written discovery and the production of documents from the Kantors regarding their personal finances and business interests.

52.     This post-judgment discovery has revealed years-long, ongoing, and comprehensive efforts by Keith Kantor to conceal, hide, and obscure sources of income and assets—in concert with Karen Kantor and the entities they individually or collectively own and control.

53.     The Kantors' scheme is perpetrated through (among other things) abuse of the corporate form, straw owners, fraudulent transfers, sham mortgages, and at least one offshore bank account.

54.     On information and belief, the purpose of this scheme is to frustrate, hinder, delay, and/or defraud First Horizon in the collection of the Judgment, in addition to the collection efforts of other creditors.

### *The Kantors' Income and Bank Accounts*

55.     At depositions in December 2018, First Horizon' counsel questioned the Kantors as to, among other things, their income and bank accounts.

56.     The Kantors testified their only sources of income for payment of personal expenses are limited to social security income of $2,932 per month and Karen Kantor's income of approximately $1,000 per month as a part-time art teacher.

57.     Keith Kantor testified he has no bank, checking, or other financial accounts in his name.

58.     Karen Kantor, however, has or had two deposit accounts (the "Spouse Accounts")—one with IBERIABANK ("Iberia"), and a second with Wells Fargo Bank National Association ("Wells Fargo").

59.     Karen Kantor is the sole account holder and sole signatory over the Spouse Accounts.  Notwithstanding, the Kantors view the Wells Fargo account as a "family" account.

60.     Keith Kantor's social security income is deposited directly in Karen Kantor's Wells Fargo account.

61.     Karen Kantor's social security income is also deposited directly into her Wells Fargo account.

62.     Keith Kantor manages the Wells Fargo account, meaning among other things he signs checks (in Karen Kantor's name) and pays bills from the Wells Fargo account.

### *The Sham Mortgage on the Marital Residence*

63.     Keith Kantor and Karen Kantor have jointly owned a single-family home located at 5830 The Twelfth Fairway, Suwanee, Georgia (the "Marital Residence") since December 1999.

64.     On or around January 28, 2000, the Kantors executed a Deed to Secure Debt in favor of Bernard Sax encumbering the Marital Residence (the "Sax Security Deed"). A true and correct copy of the Sax Security Deed is attached hereto and incorporated herein as **Exhibit A.**

65.     The Sax Security Deed purports to secure a $1.2 million debt owed pursuant to two promissory notes, maturing February 1, 2010 and February 1, 2012, respectively.

66.    In December 2018, Karen Kantor testified under oath she is unaware of
<u>any</u> mortgages or security deeds encumbering the Marital Residence, she could not
provide any information about the Sax Security Deed, and she had no knowledge of
the underlying debt.

67.    In December 2018, Keith Kantor testified under oath he did not know
the amount owing on the Sax Security Deed (if any) but speculated the current debt
owing as between $100,000 to $200,000.  He also testified no payments had been
made on the underlying debt since "the 2008 time range."

68.    O.C.G.A. § 44-14-80(a)(1) provides, in relevant part, that "[t]itle to real
property conveyed to secure a debt or debts shall revert to the grantor or his or her
heirs, personal representatives, successors, and assigns at the expiration of seven
years from the maturity of the debt or debts or the maturity of the last installment
thereof as stated or fixed in the record of the conveyance or, if not recorded, in the
conveyance[.]"

69.    Barnard Sax passed away on June 11, 2007.  His daughter, Lori Beth
Sax Harmeyer, is the executrix of his probate estate.

70.    To the extent the Sax Security Deed was ever a legitimate transaction,
and to the extent it was ever enforceable, the title conveyed in the Sax Security Deed

reverted to the Kantors on February 1, 2019 by operation of O.C.G.A. § 44-14-80(a)(1).

71.     On September 16, 2020, Lori Beth Sax Harmeyer executed a Quitclaim Deed of Release, wherein the Sax Security Deed has been canceled of record (the "Sax Security Deed Release").  A true and correct copy of the Sax Security Deed Release is attached hereto and incorporated herein as **Exhibit B.**

72.     On April 4, 2017, First Horizon recorded the Kantor Writ on the general execution docket in Forsyth County Superior Court, perfecting its judgment lien against the Marital Residence pursuant to O.C.G.A. § 9-12-86.

73.     As a result of the Sax Security Deed Release and the recording of the Kantor Writ, on information and belief First Horizon has a first-priority lien against Keith Kantor's interest in the Marital Residence.

### *Shielding Assets/Income Through BDKK, MVKK, and KEKA Sugarloaf*

74.     The Kantors jointly own BDKK, MVKK, and KEKA Sugarloaf as 50/50 members.

75.     Each of these three entities is a single-asset real-estate entity whose sole source of income is rent.

76.     BDKK owns a townhome in Florida (described in more detail below) and receives its rental income in a BDKK bank account at Wells Fargo.

77.    MVKK owns a condominium in South Carolina (described in more detail below) and receives its rental income in an MVKK bank account at Wells Fargo.

78.    KEKA Sugarloaf owned commercial property in Georgia (described in more detail below) until recently and received its rental income in a KEKA Sugarloaf bank account at Iberia Bank.

79.    Karen Kantor has sole signature authority over the aforementioned bank accounts of BDKK, MVKK, and KEKA Sugarloaf.

80.    Even though Karen Kantor is 50% owner of BDKK, MVKK, and KEKA Sugarloaf and ostensibly has exclusive control over their bank accounts, in practice Karen Kantor has little, if any, involvement with these entities, their operation, or their finances.

81.    For example, Karen Kantor testified in December 2018 that she did not know whether she had any signature rights or access to any bank accounts held by BDKK, MVKK, or KEKA Sugarloaf.

82.    As further example, Karen Kantor testified in December 2018 she was unsure whether BDKK, MVKK, or KEKA Sugarloaf even had a bank account, she was unsure of basic details about their mortgages, and she did not know how the mortgage payments were made.

83.     In reality, Keith Kantor exercised exclusive control over the bank accounts of BDKK, MVKK, and KEKA Sugarloaf.   As with Karen Kantor's personal bank account, Keith Kantor managed the accounts and signed his wife's name to checks.

84.     According to Keith Kantor, none of these three entities generates personal income to the Kantors, as none of these entities generates a profit.

*BDKK Rental Property – Sham Second Mortgage*

85.     BDKK owns a townhome as rental property located at 128 Sabal Circle Cape, Port Saint Joe, Florida (the "Florida Residence").

86.     The Kantors acquired title to the Florida Residence on or about October 1, 1999 and subsequently deeded the Florida Residence to BDKK on or around July 1, 2003.

87.     During First Horizon's post-judgment discovery and investigation into Keith Kantor's assets, First Horizon identified two mortgages encumbering the Florida Residence.  The Kantors both executed these mortgages on behalf of BDKK.

88.     The first mortgage on the Florida Residence is dated December 6, 2001, in the amount of $102,000, and in favor of Wells Fargo Home Mortgage.

89.    The second mortgage is dated February 1, 2009, in the amount of $150,000, and in favor of Thomas Giles (the "Florida-Giles Mortgage"). A true and correct copy of the Florida-Giles Mortgage is attached hereto as **Exhibit C**.

90.    The loan supposedly securing the Florida-Giles Mortgage matured, according to its terms, on December 31, 2018.

91.    Karen Kantor testified under oath in December 2018 that she does not know what remains due on the Florida-Giles Mortgage, does not know the terms of the Florida-Giles Mortgage, and does not know the source or details of any Florida-Giles Mortgage payments.  She also testified that she signed all relevant loan, deeds, and mortgage documents at the request of Keith Kantor, and that she does not know why BDKK borrowed money from Mr. Giles.

92.    Keith Kantor falsely testified under oath in December 2018 that the Florida-Giles Mortgage secures a loan from Mr. Giles with an outstanding balance of approximately $200,000.  According to Keith Kantor, Mr. Giles granted BDKK an indefinite extension to satisfy the Florida-Giles Mortgage. This supposed extension was granted verbally and never reduced to writing.

93.    Keith Kantor testified that he or BDKK borrowed money from Thomas Giles to "put[] it into Service Foods." When asked to elaborate, Keith Kantor refused to answer on the basis of his Fifth Amendment privilege against self-incrimination.

94.    The Kantors have never produced the promissory note allegedly secured by the Florida-Giles Mortgage.

95.    First Horizon located Thomas Giles in Waynesboro, Mississippi and subpoenaed him to testify at a deposition on August 21, 2020.

96.    At his deposition, Mr. Giles testified he had no recollection of the Florida-Giles Mortgage or any underlying debt.

97.    Indeed, Mr. Giles had no knowledge of ever having loaned money to Keith Kantor or any entity associated with Keith Kantor in the past.

98.    The Florida-Giles Mortgage is a sham transaction—an instrument that the Kantors executed and recorded in the real estate records of Gulf County, Florida to give the appearance that BDKK has little or no equity in the Florida Residence.

99.    At considerable expense, First Horizon caused Thomas Giles to execute a Satisfaction and Release of Mortgage instrument on October 12, 2020, wherein the Florida-Giles Mortgage was canceled of record ("Florida-Giles Mortgage Release"). A true and correct copy of the Florida-Giles Mortgage Release is attached hereto and incorporated herein as **Exhibit D.**

### MVKK Rental Property – Sham or Unenforceable Second Mortgage

100.    MVKK owns a townhome as rental property located at 342 Coveview Court, Salem, Oconee County, South Carolina (the "South Carolina Residence").

101.   The Kantors acquired title to the South Carolina Residence on or around October 19, 2000 and subsequently deeded the property to MVKK on or around August 23, 2003.

102.   During First Horizon's post-judgment discovery and investigation into Keith Kantor's assets, First Horizon identified two mortgages encumbering the South Carolina Residence.   The Kantors both executed these mortgages on behalf of MVKK.

103.   The first mortgage is dated August 29, 2003, in the amount of $148,860, maturing September 1, 2033, and in favor of Washington Mutual Bank.

104.   As with the second mortgage granted by BDKK in favor of Thomas Giles, the second mortgage that encumbered the South Carolina Residence is a mortgage in favor of Thomas Giles in the amount of $150,000 (the "South Carolina-Giles Mortgage").   The South Carolina-Giles Mortgage is undated but bears a signature date of April 17, 2009. A true and correct copy of the South Carolina-Giles Mortgage is attached hereto as **Exhibit E**.

105.   The loan supposedly securing the South Carolina-Giles Mortgage matured, according to its terms, on December 31, 2018.

106.   Karen Kantor testified under oath in December 2018 that she does not know what remains due on the South Carolina-Giles Mortgage, does not know the

terms of the South Carolina-Giles Mortgage, and does not know the source or details of any South Carolina-Giles Mortgage payments.

107.   Keith Kantor falsely testified under oath in December 2018 that the South Carolina-Giles Mortgage secures a loan from Mr. Giles with an outstanding balance of approximately $200,000.  According to Keith Kantor, Mr. Giles granted MVKK an indefinite extension to satisfy the South Carolina-Giles Mortgage. This supposed extension was granted verbally and never reduced to writing.

108.   The Kantors have never produced the promissory note allegedly secured by the South Carolina-Giles Mortgage.

109.   At his deposition, Mr. Giles testified he had no recollection of the South Carolina-Giles Mortgage or any underlying debt.

110.   On or about October 1, 2020, Thomas Giles executed a Mortgage/Deed of Trust Satisfaction instrument, wherein the South Carolina-Giles Mortgage was canceled of record ("South Carolina-Giles Mortgage Release").  A true and correct copy of the South Carolina-Giles Mortgage Release is attached hereto and incorporated herein as **Exhibit F.**

### *Shielding Assets/Income Through NAMEDProgram, KIC Foods, and KIG Trust*

111.   NAMEDProgram is a Georgia limited liability company organized by Keith Kantor on June 30, 2015.

112.   Keith Kantor is NAMEDProgram's registered agent and, according to filings with the Georgia Secretary of State's office, NAMEDProgram's principal office address is the Marital Residence.

113.   Keith Kantor organized or caused someone else to organize NAMEDProgram on his behalf on the same day that the Loan matured (June 30, 2015) and less than two months before First Horizon filed the Lawsuit.

114.   In July 2015, Keith Kantor resigned as CEO, CFO, and secretary of Service Foods, citing health reasons.

115.   Notwithstanding this resignation from Service Foods for purported health reasons, Keith Kantor began operating NAMEDProgram as a new vehicle to earn money and shield income from creditors.

116.   According to Keith Kantor, all income received by NAMEDProgram goes towards operating expenses.

117.   As of September 2019, Keith Kantor testified that has worked for NAMEDProgram continuously since its inception but has drawn no salary and earned no compensation for his services.

118.   According to Keith Kantor, NAMEDProgram does not keep records of current and previous customers of its services.

119.   According to Keith Kantor, NAMEDProgram does not keep any financial records other than a checking account.

120.   According to Keith Kantor, NAMEDProgram's sole asset is a checking account at Bank of America—an account for which he has sole signature authority.

121.   Keith Kantor testified in September 2019 that his sole employment is providing consulting services to NAMEDProgram.  In other words, according to Keith Kantor, he only works for NAMEDProgram and receives no salary or compensation of any kind.

122.   When asked about check copies produced in discovery written to KIC Foods, Keith Kantor identified the checks as "for consulting," after which the following exchange occurred:

> First Horizon Counsel: I believe you testified that your sole employment is with NAMEDProgram. Is that accurate?

> Keith Kantor: No.

> First Horizon Counsel: Okay. So you also consult on behalf of KIC Foods?

> Keith Kantor: Yes, they're sort of interchangeable and they shouldn't be.

123.   KIC Foods is a Texas corporation that has never been registered to conduct business in the state of Georgia.

124.   In post-judgment depositions conducted in the Lawsuit, Keith Kantor refused to answer questions about Service Foods' transfer of $3,822,274.17 to KIC Foods in 2012, 2013, 2014, and 2015, citing his Fifth Amendment privilege against self-incrimination.

125.   On information and belief, Keith Kantor is KIC Foods' sole shareholder and sole officer.

126.   KIC Foods maintains or previously maintained a bank account at Bank of America.

127.   According to Keith Kantor, KIC Foods' sole asset is this deposit account with Bank of America.

128.   Karen Kantor has sole signature authority over the KIC Foods deposit account with Bank of America despite the fact that she is neither employed by nor working for KIC Foods.

129.   Karen Kantor testified in December 2018 that she has "heard of" KIC Foods but has never worked for KIC Foods and does not even know whether her husband works for KIC Foods.

130.   As with Karen Kantor's personal account with Wells Fargo and the bank accounts of NAMEDProgram, BDKK, MVKK, and KEKA Sugarloaf

described herein above, Keith Kantor exercises control over the KIC Foods bank account and signs Karen Kantor's name on checks.

131.   On information and belief, Keith Kantor placed ownership of NAMEDProgram in KIG Trust.

132.   On information and belief, the KIG Trust was established on or around July 1, 2009.

133.   The trust agreement establishing the KIG Trust identifies (a) Josephine Kantor as grantor/settlor, (b) Karen Kantor as co-trustee, (c) Kimberly Kantor and Ryan Kantor (the Kantors' adult children) as co-trustees, and (d) Michael Cohen and Harold Pounders as co-trustees.

134.   According to the trust agreement for KIG Trust, Keith Kantor does not have any interest, whether as a trustee, beneficiary, or otherwise.

135.   Per the KIG Trust agreement, the KIG Trust was created "for the primary benefit of the grandchildren of the Grantor from time to time living, and such Charitable Organizations as the Trustee may from time to time select."

136.   Notwithstanding the foregoing, Keith Kantor admitted in a deposition that *he* established the KIG Trust, and he did so "[t]o give [his] wife and kids money when [he] die[s]."

137.   Karen Kantor testified that she is aware of the KIG Trust but does not know whether she is a trustee or a beneficiary or if her husband or children are either, and that she has no knowledge of any accounts or trustees of KIG Trust.

138.   KIG Trust has one bank account, that First Horizon is aware of, at Iberia.

139.   The only authorized signatories on KIG Trust's deposit account with Iberia are Cohen and the Kantors' children, Kimberly Kantor and Ryan Kantor, all of which are also named co-trustees of the KIG Trust.

140.   Keith Kantor essentially controls the KIG Trust account at Iberia by having Kimberly Kantor pre-sign checks on this account for his own use.

141.   Between May 31, 2017 and September 20, 2018, KIG Trust made at least seven payments by check to NAMEDProgram totaling $59,250.

142.   Keith Kantor has claimed these payments from KIG Trust represent capital contributions by NAMEDProgram's sole member.

143.   NAMEDProgram's bank records also show numerous transfers from Karen Kantor's personal account at Wells Fargo.  Between March 9, 2017 and April 10, 2019, at least 36 checks totaling $90,862.66 were written on Karen Kantor's personal account and deposited in NAMEDProgram's account. Ten of these checks identify NAMEDProgram as the payee, whereas 26 identify Keith Kantor as the

payee, who then endorsed the checks over to NAMEDProgram to deposit them in NAMEDProgram's account.

144.   At all times pertinent hereto, the Kantors have routinely used this NAMEDProgram bank account for the payment of their personal expenses.

145.   For example, at all times pertinent hereto, the Kantors have used a personal Capital One Visa credit card for personal expenses and paid the credit card bills with funds in NAMEDProgram's account with Bank of America.

146.   From March 2017 through April 2019, NAMEDProgram made at least 26 payments totaling $62,760.53 related to this Capital One Visa card.

147.   Between March 3, 2017 and April 10, 2019, at least 165 checks totaling $280,034.32 were deposited into bank accounts held by NAMEDProgram and KIC Foods.

### Hiding Assets in the Caribbean

148.   At all times pertinent hereto, Keith Kantor maintained at least one bank account and owned a condominium property on the Caribbean island of St. Maarten.

149.   Keith Kantor did not disclose these assets to First Horizon in response to written discovery.

150.   In December 2018, Keith Kantor falsely testified under oath that his property in St. Maarten is merely a "time share."

151.   On information and belief, Keith Kantor purposely concealed these, and potentially other, offshore assets to prevent First Horizon and other legitimate creditors from looking to these assets as a source of recovery.

## COUNT I

## ALTER EGO LIABILITY

152.   First Horizon incorporates the preceding paragraphs of this Complaint as if restated herein in full.

153.   Keith Kantor, either individually or jointly with Karen Kantor, owns and controls BDKK, MVKK, KEKA Sugarloaf, KIC Foods, and NAMEDProgram.

154.   Keith Kantor, either individually or jointly with others, owned and controlled Service Foods while it was still operating.

155.   Additionally, Keith Kantor has de facto ownership and control over the KIG Trust assets, notwithstanding the KIG Trust agreement.

156.   Keith Kantor has used, directed, and controlled Service Foods, BDKK, MVKK, KEKA Sugarloaf, NAMEDProgram, and KIG Trust as a family of entities with the goal of hindering, delaying, defrauding, and defeating the rights of creditors, including First Horizon, and causing harm to First Horizon through the acts specified herein.

157.   The corporate forms of Service Foods, BDKK, MVKK, KEKA Sugarloaf, NAMEDProgram, and KIG Trust have been disregarded so as to authorize piercing of the corporate veils of these entities.

158.   Service Foods, BDKK, MVKK, KEKA Sugarloaf, NAMEDProgram, and KIG Trust have overextended their privileges in the use of these corporate entities to defeat justice, perpetuate fraud, and evade contractual and tort responsibilities.

159.   Each of Service Foods, BDKK, MVKK, KEKA Sugarloaf, NAMEDProgram, and KIG Trust should be held liable for any debt incurred by each other.

160.   Among other things, this means each of BDKK, MVKK, KEKA Sugarloaf, NAMEDProgram, and KIG Trust are and should be liable for Service Foods' indebtedness to First Horizon, including the Judgment.

## COUNT II

**CIVIL LIABILITY UNDER THE GEORGIA RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (O.C.G.A. §§ 16-14-1 ET SEQ.) AND THE FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1961–1968)**

161.   First Horizon incorporates the preceding paragraphs of this Complaint as if restated herein in full.

162.   The relationship between Keith Kantor, Karen Kantor, Service Foods, BDKK, MVKK, KEKA Sugarloaf, NAMEDProgram, and KIG Trust constitutes an "enterprise" within the meaning of O.C.G.A. § 16-14-3(d) and 18 U.S.C. § 1961(4) (hereinafter, the "RICO Enterprise").

163.   At all relevant times, Keith Kantor, Karen Kantor, Service Foods, BDKK, MVKK, KEKA Sugarloaf, NAMEDProgram, and KIG Trust are and were co-conspirators and participants in the RICO Enterprise.

164.   Keith Kantor, Karen Kantor, Service Foods, BDKK, MVKK, KEKA Sugarloaf, NAMEDProgram, and KIG Trust operated the RICO Enterprise by the actions set forth herein.

165.   The purpose of the RICO Enterprise is and was to defeat the rights of legitimate creditors such as First Horizon, and to avoid paying legitimate debts, such as the debts at issue in the Lawsuit and the related Judgment.

166.   The RICO Enterprise is and was engaged in interstate commerce and in activities affecting interstate commerce. The RICO Enterprise is operated through individuals residing in Georgia and entities established under the laws of Florida, Georgia, and Texas.

167.   In operating the RICO Enterprise, Keith Kantor, Karen Kantor, Service Foods, BDKK, MVKK, KEKA Sugarloaf, NAMEDProgram, and KIG Trust

engaged in various forms and incidences of "racketeering activity" within the meaning of O.C.G.A. § 16-14-3(5)(A) and 18 U.S.C. § 1961(1).

168.   As to First Horizon, the RICO Enterprise involved several acts of racketeering activity constituting a "pattern of racketeering activity" within the meaning of O.C.G.A. § 16-14-3(4) and 18 U.S.C. § 1961(5).

169.   Predicate acts that constitute racketeering activity are enumerated in O.C.G.A. § 16-14-3(5)(A), (B), (C), and 18 U.S.C. § 1961(1).

170.   The predicate acts comprising racketeering activity in the RICO Enterprise include, without limitation, the following: (a) theft by conversion as defined in O.C.G.A. § 16-8-4, in that Keith Kantor and Service Foods lawfully came into possession of funds serving as First Horizon's cash collateral and then converted or caused the conversion of those funds in violation of First Horizon's rights to those funds; and (b) multiple instances of wire fraud in violation of 18 U.S.C. § 1343 arising out of representations made by Keith Kantor and Service Foods in connection with the allegations at issue in the Lawsuit.

171.   Through the above pattern of racketeering activity, Keith Kantor, Karen Kantor, Service Foods, BDKK, MVKK, KEKA Sugarloaf, NAMEDProgram, and KIG Trust acquired property (including, without limitation, money from First Horizon), in violation of O.C.G.A. § 16-14-4(a).

172.   Keith Kantor, Karen Kantor, Service Foods, BDKK, MVKK, KEKA Sugarloaf, NAMEDProgram, and KIG Trust (i) obtained income, directly and indirectly, from their racketeering activity, and used some or all of that income in furtherance of the RICO Enterprise, in violation of 18 U.S.C. § 1962(a); (ii) acquired or maintained their interests in or control over the RICO Enterprise through racketeering activity, in violation of 18 U.S.C. § 1962(b); (iii) participated, directly or indirectly, in the affairs of the RICO Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c); and (iv) conspired in the commission of the foregoing conduct, in violation of 18 U.S.C. § 1962(d).

173.   As a direct and proximate result of this racketeering activity, First Horizon has been injured and has suffered actual damages.

174.   Pursuant to O.C.G.A. § 16-8-6(c) and 18 U.S.C. § 1964(c), First Horizon is entitled to recover three times actual damages sustained from Defendants, plus punitive damages, attorney fees, and costs of investigation and litigation.

## COUNT III

## CIVIL CONSPIRACY

175.   First Horizon incorporates the preceding paragraphs of this Complaint as if restated herein in full.

176.   At all relevant times Keith Kantor, Karen Kantor, Service Foods, BDKK, MVKK, KEKA Sugarloaf, NAMEDProgram, and KIG Trust participated in a common scheme designed to hinder, delay, defraud, and defeat the rights of creditors, including First Horizon.

177.   This scheme is laid bare through the outright fraud used in seeking and obtaining the extension of Loan funds and maturity dates from First Horizon; in fraudulently transferring funds away, among, and between accounts all ultimately controlled by Keith Kantor; in the use of ostensibly unrelated entities all owned and controlled by Keith Kantor (either individually or jointly with Karen Kantor); in concealing assets; in the use of sham or unenforceable mortgages to give the appearance that certain assets are fully encumbered; and in obscuring or concealing sources of income to give the appearance that individuals and entities have no income after expenses.

178.   As a result of the above, First Horizon has been injured in extending credit when it otherwise would not have, in forbearing on its rights when it otherwise not would have, and has been frustrated, hindered, and delayed in attempts to collect money to which it is entitled.

179.   The participation by Keith Kantor, Karen Kantor, Service Foods, BDKK, MVKK, KEKA Sugarloaf, NAMEDProgram, and KIG Trust in the

aforementioned schemes makes the them jointly and severally liable to First Horizon for the resulting damages, in an amount to be proven at trial, together with pre-judgment interest at the legal rate.

## COUNT IV

## AVOIDANCE OF TRANSFERS UNDER THE UNIFORM VOIDABLE TRANSACTIONS ACT, O.C.G.A. §§ 18-2-70 to -85

180.   First Horizon incorporates the preceding paragraphs of this Complaint as if restated herein in full.

181.   Pursuant to O.C.G.A. § 18-2-74(a), a creditor may seek to avoid a transfer or obligation—regardless of whether the creditor's claim arose before or after the transfer was made  or obligation was incurred—if the debtor made the transfer or incurred the obligation: (1) with the actual intent to hinder, delay or defraud a creditor or (2) without receiving a reasonably equivalent value in exchange and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

182.   Keith Kantor organized and created NAMEDProgram on or around June 30, 2015.

183.   Keith Kantor later transferred 100% ownership of NAMEDProgram to the KIG Trust.

184.   The KIG Trust did not pay any sum of money to Keith Kantor in return for this transfer of ownership nor did the KIG Trust otherwise directly or indirectly give Keith Kantor any other material consideration in return.

185.   Keith Kantor was insolvent at the time of this transfer and was facing the prospect of a sizeable judgment entered against him. Indeed, as noted above, NAMEDProgram was organized on the same day that the Service Foods Loan matured (June 30, 2015) and less than two months before First Horizon filed the Lawsuit on August 17, 2015, in which it sought millions of dollars of damages from Keith Kantor for fraud, conversion, breach of fiduciary duty, and breach of guaranty.

186.   On information and belief, this transfer of NAMEDProgram to the KIG Trust was made with the intent to harm First Horizon, to delay, defraud, or deter First Horizon from enforcing and collecting the debts evidenced by the Judgment, and/or to remove or conceal personal assets from First Horizon.

187.   Keith Kantor's transfers of his interest in NAMEDProgram to the KIG Trust, without receipt of reasonably equivalent value in return, has harmed Plaintiff and its ability to collect the outstanding balance of the Judgment.

188.   The Court has authority to and should (a) enjoin any further disposition of the ownership of NAMEDProgram during the pendency of this case, and (b) avoid each such transfer of ownership of NAMEDProgram, as necessary in order to aid Plaintiff in the collection of the Judgment.

## COUNT V

## REVERSE VEIL PIERCING

189.   First Horizon restates and incorporates the preceding paragraphs of the Complaint as if fully set forth herein.

190.   Keith Kantor, acting in concert with Karen Kantor, has used BDKK as a vehicle to shield assets and income from First Horizon and other creditors.

191.   Keith Kantor, acting in concert with Karen Kantor, has used BDKK to hold personal assets and pay personal expenses, ignoring the corporate formalities and distinction between a company and its owner(s).

192.   Under applicable Florida law, this Court can hold BDKK liable for the debts of Keith Kantor, including the Judgment.

193.   First Horizon requests that the Court exercise its legal and equitable powers to pierce the veil between BDKK and its members, Keith Kantor and Karen Kantor, so that BDKK is charged with the debts of the Kantors including the Judgment.

## COUNT VI

## BAD FAITH

194.   First Horizon restates and incorporates the preceding paragraphs of the Complaint as if fully set forth herein.

195.   At all times pertinent hereto, Defendants have acted in bad faith.

196.   At all times pertinent hereto, Defendants have caused First Horizon to incur unnecessary trouble and expense.

197.   At all times pertinent hereto, Defendants have been stubbornly litigious.

198.   Pursuant to O.C.G.A. § 13-6-11, First Horizon claims reasonable attorney's fees and expenses of litigation from Defendants.

## COUNT VII

## PUNITIVE DAMAGES

199.    First Horizon restates and incorporates the preceding paragraphs of the Complaint as if fully set forth herein.

200.   The actions of these Defendants demonstrate intentional or willful misconduct and an entire want of care or indifference to consequences, so as to justify an award of punitive damages.

201.   The Court is authorized to impose punitive damages against Defendants under O.C.G.A. § 51-12-5.1.

**WHEREFORE**, having set forth its Complaint against Defendants herein above, First Horizon requests the following relief:

A.   Under Count I, for a judgment finding that Service Foods, BDKK, MVKK, KEKA Sugarloaf, KIC Foods, NAMEDProgram, and the KIG Trust are alter egos of one another and that each should be held liable for any debt incurred by each other, including specifically the Judgment;

B.   Under Count II, for a judgment against Defendants pursuant to the Georgia RICO Act and the Federal RICO Act in favor of First Horizon in an amount equal to three times First Horizon's actual damages sustained, plus punitive damages, attorney fees, and costs of investigation and litigation;

C.   Under Count III, for a judgment against Defendants, finding each of them jointly and severally liable for their civil conspiracy in causing tortious damage to First Horizon in an amount to be proven at trial;

D.   Under Count IV, for a judgment pursuant to the Georgia Uniform Voidable Transactions Act voiding Keith Kantor's transfer of NAMEDProgram to the KIG Trust, and finding Keith Kantor and the KIG Trust liable for the same;

E.      Under Count V, for a judgment against the Kantors and BDKK, finding that BDKK's status as a separate legal entity should be pierced and disregarded and finding BDKK jointly liable to First Horizon for the Judgment;

F.      Under Count VI, for a judgment pursuant to O.C.G.A. § 13-6-11 against Defendants for reasonable attorney's fees and expenses of litigation;

G.      Under Count VII, for a judgment against Defendants for punitive damages in an amount to be determined at trial;

H.      Under all Counts, for nominal damages in the alternative;

I.      Under all Counts, for post-judgment interest on the principal sum awarded at the legal rate; and

J.      Under all Counts, for such other and further relief the Court deems just and appropriate.

Submitted by:

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.


/s/ Kevin A. Stine
Kevin A. Stine
Georgia Bar No. 682588
Kstine@bakerdonelson.com
Kathleen G. Furr
Georgia Bar No. 589008
Kfurr@bakerdonelson.com

Tim Colletti
Georgia Bar No. 972791
tcolletti@bakerdonelson.com
Monarch Plaza, Suite 1500
3414 Peachtree Road, N.E.
Atlanta, Georgia 30326
404.577.6000 (Telephone)
404.238.9710 (Facsimile)

*Counsel for First Horizon Bank*